Our first case is Medmix Switzerland v. Zinnial Systems, 2024-15-16. Ms. Oliver. Good morning, and may it please the Court. Angela Oliver on behalf of Medmix. There are two main issues before the Court, claim construction and motivation. Because the Court can fully resolve this case on claim construction, I'll begin with that issue. The problem with the Board's analysis is that it found that a planar ramp could be taught by rounded threads. The Court should reverse because the claims require engagement parts that are ramps, and ramps require inclined planes. The only prior art used to teach that limitation here has rounded threads, and a rounded surface is not flat. But all of this is dependent on our buying your claim construction that ramps means planes. That's correct, and our construction of inclined planes is directly supported by the specification and the prosecution history here. The specification refers to a ramp as a shape. We see this in Column 9 of the patent. The patent says that it describes the engagement parts in terms of ramps and guide grooves, but it says that engagement parts of other shapes are also conceivable. So the patentee is using the term ramp as a particular shape as compared to other shapes. Just hypothetically, if we looked at the specification and prosecution history that you presented to us, and don't believe that either of those pieces of intrinsic evidence really channel us to thinking about this claim term ramp in the way that you want us to, then where does that leave us with the common, ordinary, default dictionary definition? I think that the board did apply the plane meaning. It did not explain what the plane meaning meant. Generally, we think a ramp is exactly what we've said, an inclined plane. I noticed that you didn't cite any dictionary definitions for what is the common, ordinary meaning for the term ramp. You can look at dictionaries, and you can see for yourself that it can be an inclined plane, but it can also just be a slope, and according to the dictionary, slope can be an inclined surface. So in that way, maybe the ordinary meaning of ramp can be any inclined surface, including an inclined plane. If that's the case, then it seems like the board's analysis here would hold up that use rounded threads match with the idea of an inclined surface. You're correct that we did not submit dictionary definitions, but we know that simply being an incline cannot be enough here, because incline is already present elsewhere in this claim language. So looking at the claim, if you look at limitation 1G, and I can pull this up in the patent for you. So this is appendix 101, column 9, line 65. This says, the first engagement parts of a rotational guide placed at an incline. So we already know from other claim language that the engagement parts are at an incline. So we know that ramp has to mean something different here when the patentee added that later in the claims. And so ramp, again, the patentee thought it was a shape. That's how they described it in the specification, and then they've said in column 8 that it has an inclined plane. And so I think that portion, it's just one page before. The column 8 reference to an inclined plane, it's a little murky what's going on there. It's talking about a different embodiment or damaging embodiment that was featured in discussing what the relevant embodiment here is for a ramp. Is that right? It's looking at figures 9 and 10 instead of figures 5, 6, and 7. It is. We did cite column 8 before the board as part of our analysis, and the difference between the two embodiments here is just where the ramp is located. There's two pieces in this discharge arrangement that are put together. On one embodiment, the ramps are on the mixer. In the other embodiment, the ramps are on the cartridge. So it's the same idea, just flipping where those two things are located. And so if you look at the figures that are described with respect to column 8, this is figures 9 through 12, as your Honor pointed out. This is appendix 95. We can see why this makes sense, and we can see why the statement in column 8 is indeed referring to ramps being inclined planes. So if you look at figures 9 through 11, the ramps here are numbers 46 and 47, and they are located on or as part of the socket jaws, which are 20A and 21A. That's in figure 11. And you can see that the socket jaws have the ramp as part of that. And in column 8- Ms. Oliver, I mean, this is a little brutal to walk through these figures right here, right now. I don't think this is something that was in your briefing, right? Your Honor, this reliance on column 8 absolutely was in our briefing. The reference to column 8, but the current walkthrough of looking at these figures, I mean, these figures are a little hard to process. But just going back to the specification, it's not enough to say that the definition you want to give ramps is in there. The Board looked at the specification and said shape can mean anything. There's nothing. What is there in the specification that doesn't support the Board's conclusion that no shape is dictated? It can't just be, well, all the examples are inclined planes. So what more do you have? Sure. So I think it's a combination of a few things. So from column 9, we have the statement that ramps are depicted in the specification, but other shapes could be used. So that's the idea that the patentee thought ramp was a shape. That's also in the prosecution history, which we can talk about. But I'll come back to that after I finish Your Honor's question about the specification. In column 8, then we have the inclined planes, which refers back to the ramps 46 and 47 being inclined planes. And then we have all of the figures that show this as a flat, inclined surface. And in column 9, we know that that flat, inclined surface is because the patentee has described this in terms of ramps, that shape. And so now looking quickly to the prosecution history, this was an intentional – But just to finish that point on the specification, under our case law, that's not enough, right? Even if all the examples suggest the definition you have, it uses the word shapes. And it doesn't, as a matter of lexicography, limit shape to the inclined planes. So I'm not sure, maybe it tilts a little in your direction, but it's not dispositive of the issue we're here on, right? So generally that is true, that just because there's one depiction that you don't read that into the claims. But here the prosecution history changes that. Because originally our claims did not require this ramps limitation. It said engagement parts. And we know from column 9 that engagement parts could be ramps or other shapes. So originally we tried to claim something broader, broader shapes. But then in response to a rejection, we specifically amended our claims to add this particular shape of ramps. And we said in our remarks when we were doing so that we were trying to clarify the structure and effect of the engagement parts. And so this is a case where we started with a broader specification. And then during prosecution we expressly narrowed it to a particular shape, ramps. And that appears now in the claim language. So that's why it's not reading in an embodiment or just limiting to the preferred embodiment here. That's not the concern. We have prosecution history that takes us away from that concern. What if there was, I don't know, in the prior art something that very much looked like a ramp but the surface was all incredibly bumpy? Technically that wouldn't be an inclined plane. Would you say, oh, that can't count as a ramp even though, I don't know, maybe most people of course would say it was a ramp even though it had an incredibly bumpy surface? I think in the context of what we have claimed in this specification, that would be right. Because the bumpiness would make it no longer a flat surface. And based on Column 8, we've said it's an inclined plane. And plane is flat. It's two-dimensional. Your Honor, just to briefly address—  I'm sorry. One bump on the flat surface is no longer a ramp? I think that would not be planar. There's a little bit of a pothole. It's no longer a ramp. My skateboard ramp has a little bit of a divot. It's no longer a ramp. I think skateboard ramps might generally be different as far as how that term is used in the industry. But regardless to the question about if there's a bump or a pothole, I think we'd have to look at the prior art, of course. But I think the answer would be if it's not flat, what we've argued here is it has to be planar. And so if there's some other deviation in the ramp, some other curvature, then that would not be sufficient. Again, this is the unique case where I think the prosecution history does clarify that this is limited to exactly what the patentee tried to claim with this particular shape. And the best evidence is what we've cited in Column 9, Lines 9 through 12, Column 8, and in the figures that depict it in this way. Now, under that correct construction, the prior art reference U cannot teach ramps because the threads in U are rounded. Planar, as we've discussed, means flat, and U does not have any planar surfaces. The threads are simply rounded. That is the only thing that the U reference teaches. Our expert said in paragraph 200 of his declaration that the coarse threads in U are only presented as rounded thread forms. And there was no rebuttal testimony to dispute that presented in the reply, even though Zinneel did present a reply declaration. Now, in the red brief on appeal, Zinneel suggests that maybe there should be a factual dispute here, that perhaps you could conceivably teach something else. But there was just no evidence to support that, and that is not what they argued to the board. Did the expert say something about that? Their expert during our deposition or our, yes, our deposition of their expert said that, speculated that U could potentially have other shapes. But when he was pressed on that, he could not cite anything in the U reference that actually supported that. And then he said, yes, U's threads do seem to be rounded based on how the ends look. And that's at Appendix 2932 and 2933 of his testimony. And that's it. That's all the evidence that the red brief cites for this. This was never argued in their briefing below or in their expert's affirmative declarations. This was not the argument they presented for why U would teach this under our construction. So this, we believe, is also the rare case where if the court agrees with our construction, the court can reverse, because no reasonable fact finder could conclude that the rounded threads are plainer. Shall we save the rest for you? Your Honor, may I just briefly for 30 seconds touch on motivation? Your Honor, our motivation argument is very straightforward. It's simply that in the motivation analysis, the board skipped the very final step, which is weighing the benefit that was presented against the disadvantages that we presented. So our concerns were that if you change this and make it a loose connection, like in the U reference, you would have backdriving. You would have leakage. And the board addressed that evidence, but it did not take the final step of saying, okay, just because of this benefit might exist. Would it be worth making other changes, including fundamental changes, to address those concerns? That sort of weighing is what the board's decision is missing. And with that, I'll reserve the rest of my time for rebuttal. Mr. Bova. Mr. Bova, could you start with the last point we heard from Ms. Oliver about the motivation to combine and whether the board, I don't know, did a conclusory effort at weighing the disadvantages to the possible combination of the references? Of course, Judge Hinn. Good morning, Your Honor. The board stepped through. Well, first, the board didn't necessarily say we need to consider the disadvantages because the claims are not limited to high-viscosity fluids. And that's what MedMix's arguments were focused on. They were saying, well, if you have these very thick materials with these kinds of nozzles, you might experience leakage or backdriving. And the claims are not limited to that. But the board didn't stop there. The board went through and said what a person already skilled in the art would do if presented with those problems. And they would do things like friction fit, change the diameter of the connection point to decrease the angle of the threads, which would all create a better lock. So there was a weighing, but it seems like MedMix is kind of requiring a new standard. Did the board actually say all those things? Yes, Your Honor. At Appendix 40 in the motivation to combine section, their analysis talked about, first, the mechanical advantage benefit. So this was the motivation presented the whole time, which was you want to change these threads to be inclined surfaces to achieve the mechanical advantage of fitting it when you turn it on to the device and helping it when you remove it from the device. Attaching and detaching is what they said. What they meant by attachment and detachment was being able to get a tighter fit during attachment and making it easier to detach when you're trying to unscrew it? Yes, Your Honor. That's what the experts said as well, which was you have the ease. The prior had issues with either having to rotate too much, and it creates too much of a pain to rotate that many times. With the U reference configuration, you only have to do a 60-degree turn, a shorter turn. And then the surfaces provided some kind of contact point where you have an easier way to guide it into the device when you attach it for the attachment. And then you have the guided detachment, so you have a force pressing the top off of the device when you were detaching it. That's what the purpose of the inclined surfaces were. So what about the theory that there's going to be leakage because you don't get the same kind of tight seal that you do in the original Keller 574 embodiment? Right, and that's where the Board addressed it at Appendix 40, where they said that there's no claim limitation addressing leakage. And it didn't stop there. Dr. Gale, which was Zinnial's expert, said an ordinary artisan would friction fit it to get a better seal, and moreover could use tangs if that were a problem, which was just to address any of the back drive or leakage. That's at Appendix 40. But what does the first part of that mean? We've had a few cases that are similar. What was the Board saying about when they look back to the claim itself and the claim limitation and says there's nothing addressing leakage? Is that appropriate? Is that proper? I think it can be, yes, Your Honor, because the question is, well, would a person of ordinary skill in the art be motivated to arrive at the claim dimension? So looking at the claim terms, it would be kind of a tougher hurdle or higher hurdle to require proving motivation to overcome unclaimed. But that makes it sound like you're using the claim as a road map of what to shoot for. And I've always thought the motivation analysis, forget about the claim. Just a skilled artisan in this art trying to connect these parts together, what would they be motivated to do? And again, forget about the claim. And if by happenstance one of those possible obvious combinations lands on and recites what the claim is, then you've got your 103. So forget about whether the claim says it's got to be a high viscosity material going through the nozzle or not. What's the basis to say this combination makes good sense? In light of the fact that we already know Killer 5704 has all these features that ensure that the nozzle doesn't pop off? Well, the board addressed that with respect to you have the motivation to combine was always what they call the mechanical advantage, which was what I walked through before with the attachment and detachment. So Keller didn't have the detachment advantage because it only allowed for circumferential turning, didn't have guided release on detachment. So the motivation to combine was to provide the advantage on both the attachment and detachment. So that alone is enough. And then MedMix raised, oh, potential concerns with leakage. And that's when Zinneo replied with, well, there are, wait, first, these are not claims. Second, not necessarily issues with all materials because Keller, just like the 578 patent, is not limited to only high viscosity fluids. So there's no discussion of any kind of materials in the 578 patent at issue here or the Keller reference. So this was Zinneo replying on, well, if these issues came up, a person with a skill in the art would know how to address those. And the board walked through that at Appendix 40 and also in the reasonable expectation of success section at Appendix 46, 51, and 62, where it talked about all the variables a person with a skill in the art knew how to and would change to address. And that included manipulating the coefficient of friction because that would have a tighter fit for the materials, changing the diameter and changing the lead angle to create a self-locking mechanism. All of this was before the board. Expert testimony, substantial evidence supports those findings. Can I just take you back to my point because I'm just not satisfied? And that's not your fault. That's probably my fault. But it bothers me that the board's resting on the fact that there was no claim limitation addressing leakage. Is that appropriate? I mean, if you're going to find two references and it's going to create an explosion, but then the board says, well, there was nothing in the claim that dealt with we're preventing explosions, it doesn't really track for me. So do you think this is arguably harmless error or is there a defense to what the board did in the cases? Yes, Your Honor. To the extent that that is alone an error, it would be harmless because the board did continue to say how one would address it. So then at least in the Rule 28J letter that MedMix submitted in the Natera case, that was talking about motivation to combine what is claimed and then also talked about unclaimed features. I think I have the, this is a summary, but unclaimed features can be relevant if a person or any skill in the art would have considered them. So in this case, the board was saying those are unclaimed features, but if they were something that a person or a skill in the art would have been worried about, then he or she would have known how to address those and would have done it. Before your time runs out, I wanted you to address the prosecution history argument that Ms. Oliver has made. Sure. So I'll jump to the prosecution history. I can also respond on the specification sites that Ms. Oliver cited. But in the prosecution history, that was all about, this is in Volume 2 of the appendix, that was all about how these pieces fit together. So starting with Appendix 1227, these were comments from MedMix's counsel that was arguing about the Collin reference. And the main dispute there was there's no guidance in the axial direction taking place during disengagement because Collin had a bayonet type where on the bottom had a flat surface, didn't have an incline, and it didn't give you that benefit during disengagement. And in the prosecution history arguments at 1241 through 1243, this is also a key focus, which was at 1241, talking about the claim itself, in the middle of that paragraph, this configuration, which is now the claim grooves and ramps, establishes a form fit in each phase of the rotation. Again, focused on the attachment and disattachment, or disengagement. And then on 1242, arguing against Collin in that bottom paragraph, there is no guidance in the axial direction taking place during disengaging. That could, as a bayonet type connection, simply does not provide means, for example, guide grooves or ramps that could establish a form fit and thus guidance also during disengaging. Nothing in Collin provides that ability. And then in the bottom underlined, there's nothing in Collin for either engagement parts to act against in order to lift the accessory apart from the cartridge. So the focus here was Collin did, and MedMix describes Collin's depictions as incline surfaces, which is what the board understood ramps to mean. The focus here was Collin didn't have the ramps or the incline surfaces on what I'll call the bottom part that would touch towards where it seals onto the cartridge. And so they were arguing, well, we have in our claims now, MedMix has two ramps, so you get the benefit during attachment and disengagement. And then MedMix described that as, on 1243, allowing a simple and easy way to increasingly secure on or remove the accessory part from the cartridge. So this whole focus was on how it fits onto the cartridge and not solely about ramps. And even then, there's nothing in the prosecution history that says ramps mean specifically inclined planes to the exclusion of any kind of variable that Judge Chen was referencing earlier, which could include a curve, a bump, anything that would achieve what the claim later says, which is to achieve this form-fit function, and that gives you the better attachment. I'd like to just address the claim language itself in Column 9 of Appendix 101 that Ms. Oliver talked about, which was the engagement part at an incline. Again, I don't think there's any dispute that the board's understanding would include an inclined surface. So an incline doesn't get you to what MedMix is asking for, which is an inclined plane, no undulations, no change, a flat surface. And the same goes for Column 8, and Judge Chen, you had asked about this too, and I think at best that is murky. There's no depiction in any of those figures about what even the end wall is and what shape it is. There's no annotation of it. And then there's no clear connection that likewise means that the ramp itself has to be an inclined plane, and also that's a preferred embodiment that the claims are not necessarily limited to, as Judge Prost was pointing out. They're not limited to the figures or the embodiments. Specifically, when on Appendix 99, MedMix refers to these at the top of Column 5 as preferred embodiments. What should we take away from that one passage at the top of Column 9, talking about starting at Line 9, in addition to the illustrated design of the engagement parts as ramps and guide loops, engagement parts of other shapes are also conceivable, which are designed to respond to each other. So what other shapes could they be talking about other than ramp? Well, I think that's actually talking about the illustrated design of the engagement parts, both the ramps and the guide grooves. So again, talking about the figures and the illustrated designs as they are in those figures, but other shapes could meet those that are inclined surfaces, because that's what a ramp means. And this is in the Red Brief, too, that the Segaro reference, S-O-G-A-R-O, shows a ramp, like a skateboard ramp, where it's kind of a sloped ramp. That is a ramp that in the Gray Brief at 16 to 17, MedMix seems to concede that that would be considered a ramp. But that's not a flat plane. So let me make sure I understand your interpretation of this passage. Are you saying that when it's talking about ramps, it's talking about the ramps as illustrated in Figures 5 and 6, and then when it talks about other shapes, it's talking about other versions of ramps? Because I had thought it was ramps and then other shapes that are non-ramps. But you're saying, no, we're talking about different species of ramps in this passage? I think it could be both, where you have other shapes besides those that are depicted or illustrated, where you could have other types of ramps or other shapes that still achieve this function, and that's the focus of the claim when it goes through a very long paragraph about what is achieved with these engagement parts to describe their functionality. Unless your honors have any other questions. Thank you, Counsel. Thank you. Ms. Oliver, you've got about two and three-quarter minutes. Thank you. I'll first quickly address motivation. This Court's decision in Natera does say that unclaimed factors can impact the motivation analysis, and that makes sense because otherwise it would be a strange form of hindsight. Just because a claim down the road doesn't express avoiding a particular concern, that doesn't mean that's not a concern that a skilled artisan would have addressed at the time of the invention. Now, here we know from Paragraphs 91 and Paragraphs 139 of their expert's declaration that the prior art here was focused on preventing leakage when you're using thick materials, and that's exactly the concern that would cause backdriving and leakage. The point here at the end of the day is that those were concerns a skilled artisan would have considered, and the Board did not do a weighing of those concerns to see whether the benefit proposed would have made sense in light of those concerns, particularly when the prior art references already had means to address those concerns. I think the non-precedential decision in PLASPAC is relevant here because it is highly factually similar. It's talking about backdriving and leakage concerns, and also this Court's decision in Hennepinney, which is precedential, talks about when you have to make a lot of other changes to achieve the combination, then perhaps that's an unappetizing combination and you wouldn't do it. Again, that's cited in our brief. That's all for motivation unless the Court has questions. I'll quickly address the final points on claim construction. My friend here has argued that the prosecution history was all about the form fit, but in reality it was more than that. We could have amended the claim to just say a form fit, whatever shape that takes, a form fit, but that's not what we did. We did more. We amended to require a particular shape, and that's ramps. And we know it's a shape because of column 9, ramps versus other shapes. I think the Court's decision in Saffron here is helpful because it says even if you give up more in prosecution than you had to to overcome the prior art reference at issue, we are still holding patentees to that disclaimer because of the public notice function of prosecution history. So sure, even if we could have overcome the column reference by just relying on the form fit, we did more, and we said at Appendix 1239 that this is specifically to clarify the structure and effect of these engagement parts. That is talking about the shape of the ramp, and that's what ended up in the claims. And one last point, the prosecution history did not have to say inclined planes because that is already in the specification. That's how the patentee depicted ramps in the figures. That's how they described it in column 8 where they say inclined planes. And the red brief at 47 admits that the pictures show a ramp as a flat surface, so that piece of the analysis didn't have to be in the prosecution history. But we do know that the claims were amended to require that particular shape. Thank you. Thank you, Your Honor. Counsel, thank you. Both counsel, the case is submitted.